CHANDLER, Justice,
dissenting:
¶ 16. I respectfully dissent. On our highly deferential standard of review, I would affirm the trial court’s denial of post-conviction relief. I note the unlikelihood that justice for the victims will be served, given the difficulties of retrying a case two decades after the date of the crime.
¶ 17. We will not disturb the factual findings of a trial court in denying a petition for post-conviction relief unless such findings are clearly erroneous. Rowland v. State, 42 So.3d 503, 506 (Miss.2010). I would defer to the well-reasoned logic of the seasoned trial judge as stated in his order denying post-conviction relief:
[Tjhese [canvass cards] are insufficient to undermine confidence in the verdict reached at Petitioner’s trial. Neither Lucious’ trial testimony, nor any statement given by Lucious prior to 2010, mentioned Apartment 11-E, or indicated that there was an issue regarding where he lived at the time of the murders. Therefore, even if these canvass cards had been disclosed, there would have been no reason to introduce them for impeachment purposes, leading this Court to the conclusion that the canvass notes are insufficient to create a reasonable probability that, had they been disclosed, the proceedings would have been different.
¶ 18. The majority would find a Brady[3] violation based on the purported impeachment value of the canvass cards. But the canvass cards did not facially contradict Lucious’s testimony at trial. ■ Manning’s own trial attorney, Mark Williamson, acknowledged that having had access to the canvass cards would not likely have triggered a red flag to investigate Lucious’s residence, given that, like the State, Manning’s attorney had no knowledge of the specific apartment number from which Lu-cious viewed Manning enter the victim’s apartment.
¶ 19. Lucious was known to frequent Brooksville Gardens at the time of the murders, and no one disputes his frequent presence there prior to the official start of his girlfriend’s lease: hanging out with the *308 Mannings, buying beer from Dera Mae, and, I submit, likely squatting or at least spending time in the vacant apartment on which his girlfriend was about to sign a lease. Dolph Bryan had also personally observed Lucious at Brooksville Gardens during the time of the investigation, further supporting that, to the State’s knowledge, Lucious’s testimony that he was present at Brooksville Gardens at the time of the murders was true. Forrest Allgood testified that:
All I recall is him testifying that he looked out a window and this is what he saw. Quite frankly, that’s all I was interested in. I didn’t delve into which apartment he said he was in or anything of that nature.... The only thing that was important to me was did the man see what he saw.
The supposed impeachment value of the cards therefore is not as significant as the majority would represent. Manning also has presented no evidence showing that defense counsel was precluded from reviewing the original police file containing the canvass cards, and Manning’s post-conviction counsel easily obtained the file from the police department. I therefore agree with the trial court that Manning has failed to establish the requisite prejudice for the finding of a Brady violation.
¶ 20. Moreover, Lucious’s recantation came in stages and in an inconsistent manner that supports that his recantation is not credible.[4] We first have his statements to the police from 1994 and his 1996 trial testimony, in which he testified to witnessing Manning enter the victim’s apartment on the day of the murder. He also testified to participating in or overhearing conversations during the weeks after the murders in which Manning bragged about how “it doesn’t take nothing to kill somebody” said that “if I had known that they didn’t have any more than they had I wouldn’t have killed them mother* * * * * * Between 1994 and 2001, Lucious gave at least five statements implicating Manning in the murders. His girlfriend, Likeesha Jones, also gave at least three statements during that time, also implicating Manning.
¶ 21. Then, in a 2002 affidavit, Lucious partially recanted his trial testimony and the version of events he gave at trial. While still maintaining that he lived in the apartment across the way from the murders, and that he saw a man enter the apartment the day of the murders, he claimed that he could not positively identify the man as Manning due to poor eyesight.
¶ 22. It was not until 2010 that Lucious claimed, for the first time, that he did not live at the apartments the day of the murder, that he did not observe anyone enter the victims’ apartment, that he was not present at Brooksville Gardens at all that day, and that he did not overhear any conversations whatsoever, at any time, regarding Manning’s involvement in the murders.[5]
¶ 23. Despite the official start date of the lease being a few weeks after the murders, the circumstances support Lu-cious’s original testimony that he and Lik-eesha Jones were physically present in apartment 11E by the time of the murders. The apartment records show that *309 the previous tenant had moved out several months prior to the January murders. This left the apartment physically unoccupied for several months prior to the start of Jones’s official lease. Testimony was presented at the PCR hearing that squatting was very common at Brooksville Gardens.
¶ 24. While Jones claimed at the PCR hearing that they were not living in HE at the time of the murders, she also testified that she had met with the apartment manager, Harold Williams, some time prior to moving in, at the start of the application process, and that he had informed her that the apartment had been empty, and therefore there would be no problem with her moving in. This conversation further supports the opportunity and likelihood that Jones and Lucious were physically in the apartment during the lease-application process, which included a wait period for Jones’s income verification from the welfare department. The record reflects that her lease application was in progress around the time of the January 18 murders, including a January 20 stamped application for her income verification.
¶25. Jones’s credibility at the hearing was further discounted by the testimony of Mark Williamson, one of Manning’s trial attorneys. Jones had testified that, around the time of trial, she identified Williamson as Manning’s lawyer from either the newspaper or television, and that she looked up his number in the phone book and called him twice to tell him that Lucious’s eyewitness testimony would not be reliable because they did not live at the apartments at the time of the murder. But Williamson testified at the PCR hearing that if he had received such calls, he certainly would have followed up on them. Lucious was, without question, an extremely important witness. But until his unreliable recantation, whether he was living at Brooksville Gardens on the day of the murder was never a contested issue. And, regardless of the technical start date of the lease, the testimony and evidence established that Lucious frequented Brooksville Gardens before the lease start date.
¶ 26. On post-conviction review, we owe high deference to the trial court’s determination of the credibility of the witnesses. The record reflects that the trial judge took this task very seriously, insisting, for example, that Lucious be transported to testify in person rather than submit a video affidavit. Lucious’s gradual and inconsistent recantation of his trial testimony is not credible, and Jones’s testimony was refuted by the testimony of Manning’s trial attorney. Because I would affirm the trial court’s denial of post-conviction relief, I respectfully dissent.
PIERCE, J., JOINS THIS OPINION.

. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

. Lucious was only one of many trial witnesses who placed Manning at Brooksville Gardens on the day of the murder, including' Nancy Elliott, Barbara Duck, and Larry Harris.

. At the time of this version of the story, Lucious was in Missouri serving life without parole and three concurrent life sentences for first-degree murder, first-degree assault and two counts of armed criminal action.